### EX PARTE CAROLINA NATIONAL BANK.

### GIBBES v. GREENVILLE AND COLUMBIA R. R. CO.

### STATE, EX RELATIONE ATTORNEY GENERAL v. SAME.

1. A finding of fact by the Circuit judge reversed because opposed to the preponderance of the evidence.
2. Money, necessary for the proper and successful management of a railroad, borrowed by the officers of the road while acting as receivers under an order of court, giving them power "to continue in the possession and management of the property," should be repaid out of the fund in court, realized from the income of the road while in the receiver's hands.
3. Such loan having been secured by a deposit of bonds belonging to the railroad company, which bonds were afterwards sold to the credit of the loan, and the payee, under a call for creditors, having presented his petition for the payment of the balance out of the receiver's fund, other creditors could not assert, by way of counter-claim to this petition, the right to have the hypothecated bonds surrendered to the court or their value accounted for.
4. Fifty-four Bond Case, 15 S. C. 304, and Ex parte Brown and Wife, Id. 531, recognized and followed.

---

Before Fraser, J., Richland, December, 1881.

T

The facts necessary to a proper understanding of this case will be found stated in the opinion. • The orders appointing receivers need not be given, as they will be found in the *Fifty-four Bond Case*, 15 *S. C.* 304, in *Ex parte Benson & Co.*, *ante* 38, and in other cases.

The Circuit decree, omitting its statement, was as follows:

The first question is as to the validity of petitioner's claim. It is not necessary for me to state again my reasons for holding that there is nothing in the language of Judge Melton's order, or of any ruling of the Supreme Court, to warrant the inference which has been pressed upon me, that the president and board of directors of the Greenville and Columbia Railroad Company had, under that order, the power to conduct and carry on the business of the company "in like manner as they have heretofore done." The words in the order are "under the order and subject to this court." These are words of large signification, but they convey the powers and prescribe the duties of a railway receiver, and no more. The business of the company was that of a common carrier of freight and passengers. It was only a privilege to make contracts for the loan of money. Whatever was necessary for the business of the company was within the range of their powers and duties. "All outlays made by the receivers in good faith in the ordinary course, with a view to advance and promote the business of the road and to render it profitable and successful, are fairly within the line of discretion, which is necessarily allowed to a receiver entrusted with the management of a railroad in his hands." *Cowdrey* v. *The R. R. Co.*, 1 *Woods* 331.

If it were clearly shown that money was borrowed to carry on the operations of the road as a common carrier, I would not say that it ought not to be repaid out of the fund. Before this is done, however, the court ought to have proper evidence that it was necessary for this purpose, and if not, parties must look to the personal responsibility of the receiver. If money-lenders are not satisfied with this personal responsibility, it is an easy matter to wait until an order of the court can be obtained. All other trustees borrow money for the use of the trust-estate in the absence of express power, only on their own personal respon-

sibility, and can be re-imbursed after it has been shown to have been properly expended. I see no reason to apply a different rule to receivers.

I cannot be controlled in this matter by the testimony of a very intelligent and experienced witness who says that all the money borrowed was "necessary." The facts do not bear him out. We find these receivers, in disregard to orders of the court, for four years paying interest on the whole bonded debt—buying and selling bonds of this company—of the Laurens Railroad Company, of the Blue Ridge Railroad Company, making an extension to connect with the Air Line railway, paying to a debt of T. Bush, for which they were in no way responsible, about $15,000, and on the debt of H. H. Kimpton, an unsecured debt contracted before the receivership, over $27,000.

The order of Judge Melton gave to the receivers no power to borrow money, so that it must be repaid as a mere matter of contract, and I do not think it was necessary or proper to do so in this case. If the petitioner dealt with the receivers with a view to their character as receivers and not as officers of the company, then petitioner must have known that he was dealing with the funds, which were under the control of this court, and which ought not to have been purchased or sold without its sanction. I doubt if petitioner ever looked to the receiver's fund for payment, much less to a claim to be superior to bond-holders who held liens. I do not think, therefore, that there is any hardship to petitioner in this view, and the claim ought not to be allowed.

With regard to the counter-claim, I have nothing to add to the views expressed in a judgment to be filed at the same time with this in *Ex parte George W. Williams, Treasurer* [see next case, *post*]. If it were necessary to decide the question, I would be inclined to the opinion that such a counter-claim could not be set up in this form of proceeding. I do not see how a counter-claim, to be enforced against the person of the petitioner, can be set up against a mere application to be paid out of a fund in court. In the view of this case, which I have presented in *Ex parte Williams*, I do not think that there is any ground for this counter-claim in any form of action, and it ought not to be

allowed. There is no theory of which I am aware on which it could be allowed which would not re-open all the issues between the bondholders in this case, and, perhaps, lead to new and unexpected litigation.

It is, therefore, ordered and adjudged, that the petition and counter-claim be dismissed.

From this decree both parties appealed. Petitioner's exceptions were as follows:

1. Because his Honor erred in holding that the order of Judge Melton conveyed the powers and prescribed the duties of a railway receiver, and no more; whereas his Honor should have held that the powers conveyed by said order were more extended, and the duties imposed thereby more general than those usually conferred and imposed upon railway receivers.

2. Because his Honor erred in holding that the loan set forth in the said petition was unnecessary, and in this connection disregarded the uncontradicted testimony of the witness Manson, who proved that all loans made were necessary to the proper conduct and management of the business of the road.

3. Because his Honor erred in deciding that the order of Judge Melton conferred upon the president and directors, acting as receivers, no power to borrow money.

4. Because his Honor erred in not allowing the claim, and in ordering and adjudging that the petition be dismissed.

The exceptions of Clyde et al. were as follows:

1. That his Honor having decided that the receiver had no right or authority to borrow money, it followed, necessarily, that the receiver had no right or authority to pledge the assets of the road for money so borrowed, and his Honor should have held that the assets so pledged were illegally pledged.

2. That his Honor, having held that if the petitioner dealt with the receiver, " he must have known that he was dealing with the funds which were under the control of this court, and which ought not to have been purchased and sold without its sanction," should have further held that the funds or assets acquired by the petitioner, without the sanction of the court,

were illegally acquired, and that petitioner thereby became liable to restore them, or to account to the court for their value.

3. That it was proved that the president of the Carolina Bank was a director of the Greenville and Columbia Railroad Company, and one of the receivers appointed by the order of Judge Melton, and was annually re-elected director until his death, in 1880, and that his Honor should have held that the bank had full notice that it was dealing with the receiver, and obtaining assets which were under the control of the court.

4. That his Honor erred in holding that the doctrine of *lis pendens* applied to this case. That the question is not whether these particular bonds pledged carried notice with them, but is whether one dealing with a trustee, a receiver, and acquiring from him trust property, which he had no right to part with, except by order of court, can hold such property as against the *cestui que trust*.

5. That his Honor having held that the receiver had no authority to borrow the money, and that the petitioner, dealing with the receiver, was dealing with funds which were under the control of the court, and could not be purchased or sold without its sanction, by the dismissal of the counter-claim, leaves the petitioner in possession of assets illegally acquired from a trustee; and to the extent of the amount realized by the sale of the bonds, the petitioner profits by his illegal action, and the *cestui que trust* loses.

6. That the first part of the decree declares the transaction illegal, while the latter part gives to petitioner good title to the property illegally acquired; whereas it is respectfully submitted that petitioner should have been decreed to account for the assets or their value.

*Messrs. Melton, Clark & Muller*, for petitioner.

*Mr. James Conner*, contra.

November 27th, 1882. The opinion of the court was delivered by

MR. CHIEF JUSTICE SIMPSON. For the proper understanding of the questions involved in this case, it will only be

necessary to state the facts connected with the claim of the petitioner, the Carolina National Bank. In July, 1872, by an order of the court in the above causes, the property of the Greenville and Columbia Railroad Company was placed in the possession and under the management of the president and directors of said company, who were thereby directed to conduct and carry on the business of said company, subject to the orders of the court. It has since been decided by this court that this order constituted the president and directors receivers. Under this order, the road was operated from its date in July, 1872, to November, 1878. During this time the president and directors borrowed certain moneys from the petitioner which were used in the conduct and management of the business of the company.

The amount thus borrowed, after several renewals and payments, was finally reduced, on April 13th, 1877, to $20,000, evidenced by one note for that sum, which was renewed from that date to July 13th, 1878, the date of the last renewal. To secure the payment of this money, the president and directors deposited with the petitioner two hundred and sixty-eight bonds of the said Greenville and Columbia Railroad Company for $500 each. These bonds were sold by the petitioner on March 13th, 1880, for $13,400, the proceeds being applied to the note. The balance the petitioner seeks in this proceeding to establish against the fund in court, arising from the annual income of the road while in the hands of the receiver, or from the proceeds of the sale thereof.

Clyde, Logan and Bryan, who were holders of a large amount of the second mortgage bonds of the company, and upon whom the petition was served, answered, resisting the petition upon the ground that the receivers had no right to borrow money, nor the president to make the note in question. They also asserted the right by way of counter-claim, to have the bonds hypothecated to the petitioner surrendered to the court, or their value accounted for by the petitioner for the benefit of the second mortgage bondholders.

To this counter-claim the petitioner replied, and the case came to a hearing before Judge Fraser, who dismissed both the petition and the counter-claim. From this decree, both the petitioner

and the defendants, Clyde, Logan and Bryan, have appealed. The appeal of the petitioner involves, mainly, a question of fact, to wit, whether the loan contracted by the president and directors, and which was the basis of petitioner's claim, was necessary to the proper conduct of the road under their charge as receivers.

Without attempting to define the exact powers with which the receivers in the case were invested by the order of June, 1872, it is sufficient to say, in the language of *Cowdrey* v. *The Railroad Company*, 1 *Wood* 336, and quoted in the decree of Judge Fraser, " that all outlays made by the receivers in good faith in the ordinary course, with a view to advance and promote the business of the road, and to render it profitable and successful, are purely within the line of discretion which is necessarily allowed a receiver entrusted with the management of a railroad in his hands." This, no doubt, is the general rule, and no one who is at all familiar with the history of the Greenville Railroad since June, 1872, when the order of Judge Melton was passed, by which the president and directors were converted into receivers, and the various decisions of this court on the transactions of these receivers and the liability of the funds in their hands to claimants, rendered since 1872, can fail to see that this general rule has not been, in the least, narrowed or contracted in its application to their management. On the contrary, if not enlarged, it has been enforced with a most liberal construction. This was, no doubt, due to the anomalous character of the order and the necessities which prompted it, and for the accomplishment of which, no doubt, it was passed. See *Fifty-four Bond Case*, 15 *S. C.* 304; *Ex parte Brown and Wife, Ib.* 531; also the recent case of *Ex parte Benson & Co., ante* 38.

While this court clearly held in the two former cases, that this order constituted the president and directors receivers, yet a distinction was drawn, especially in the case of *Ex parte Brown*, *p.* 531, by Judge Fraser, as to their powers, and the powers of General Conner, who was subsequently distinctly and in terms appointed receiver, displacing the president and directors. This distinction grew out of the different language employed in the two appointments. In the first, the president and directors were

ordered to continue in the possession and management of the property, and to make report, that proper orders may be made. Under the latter, General Conner was appointed receiver *eo nomine*, "and he was required to demand and receive possession of all of the property of the company, to keep and preserve the same subject to the control, order and direction of the court, with power and authority to manage and operate the said railroad, to receive and disburse the income, the disbursements to be confined to the expense of running the road."

Whatever may be the law applicable to receivers generally, we think that the case of *Ex parte Brown and Wife*, and the *Fifty-four Bond Case*, have modified that law as to these receivers; or, in other words, the president and directors were appointed under a peculiar order, which order has been construed by this court in the two cases above referred to, and the law in reference to them is found in said cases. Under this view, and governed by these cases, we repeat that the only question before Judge Fraser was whether the borrowing of the money was necessary to the proper and successful management of the road. Judge Fraser seems so to have understood the case, where he says: "If it were clearly shown that money was borrowed, to carry on the road as a common carrier, I would not say that it ought not to be repaid out of the fund. Before this can be done, however, the court ought to have proper evidence that it was necessary for this purpose, and if not, the parties must look to the personal responsibility of the receiver."

In applying this principle, we think that Judge Fraser erred in his finding when he declined to be controlled by the testimony of Mr. Manson on the subject of the necessity of this loan. This witness had been in charge of the accounting and treasury department of the company since 1872; was treasurer from 1875 to 1878, when General Conner was appointed receiver; was entirely familiar with its financial condition; was a very intelligent and experienced witness, and was the only witness on this subject. He testified that when money was borrowed, there was necessity for borrowing, and this he states without qualification, and the explanations which he gave as to the condition of the road seem to sustain him.

The president and directors were receivers at the instance of the bondholders. These bondholders stood by and suffered this road to be operated under the order of June, 1872, for over six years, with no intimation that the rigid doctrine, now contended for as to the duties and powers of receivers, should be applied to the case, and we think it too late, now, for such claim. The road certainly received the benefit of this money, and it would be highly inequitable to throw the lender upon the general responsibility of the receiver—inequitable both to the lender and to the receivers, and this should not be done unless imperatively demanded by the legal principles involved. The manifest preponderance of the testimony, in our judgment, is against the finding of fact by the Circuit judge, as to the necessity of the loan in question by the petitioner to the receivers, and this finding is therefore reversed.

As to the counter-claim, we concur with the Circuit judge in dismissing it. "A counter-claim must be one existing in favor of a defendant and against a plaintiff, between whom a several judgment might be had in the action and arising out of one of the two following causes of action: 1. A cause of action arising out of the contract or transaction set forth in the complaint as the foundation of plaintiff's claim, or connected with the subject of the action. 2. In an action arising in contract, any other cause of action arising also on contract, and existing at the commencement of the action." *Code*, § 173.

Tested by this provision of the code, we do not find a single element of a counter-claim in the matter attempted to be set up here by Clyde, Logan and Bryan. In the first place, no separate judgment could be rendered in their favor against the petitioner for the bonds in question, even if the petitioner could be held liable for these bonds. If these bonds were, in fact, trust property, which the petitioner improperly obtained from the trustee, he might, by a proper proceeding, be made to account to that estate for their value, subject to distribution under the order of the court among the *cestuis que trust;* but we do not see how, under this petition, Clyde, Logan and Bryan could obtain a judgment in their behalf for the value of these bonds. In fact, they do not ask this; they claim that the bonds in question

shall be delivered to the master, or their value paid to the master. This at once shows that the matter set up is not a counter-claim, and this is further evident from the fact that the claim does not fall under either of the two classes mentioned in the code above as constituting a counter-claim.

It is neither a claim arising out of the contract or transaction set forth in the complaint as the foundation of plaintiff's claim; nor does it arise on contract existing in favor of Clyde, Logan and Bryan at the commencement of the action. If it is a valid claim at all, it arises from an equity principle established and to be enforced through the equity jurisdiction of the court. Its foundation, if any, is that wholesome equity doctrine which holds a party responsible for trust property purchased with a knowledge of the trust and in violation of the rights of the *cestuis que trust*. Here a petition was filed, under a call for creditors, to establish a note against an insolvent company, so as to receive payment out of the funds in court; another creditor resists this debt and sets up, by way of counter-claim, the fact that the petitioner has diverted a portion of the trust fund from its proper destination, and demands that he shall return this property to the trust-estate. If this demand is a just one, and well founded, there is a remedy; but it would be stretching the doctrine of counter-claim beyond all precedent to permit this question to be adjudged and determined under such a proceeding.

We think that the claim of the petitioner should be established against the income fund in the hands of the court, and that the counter-claim should be dismissed. It is the judgment of this court that the decree below be affirmed as to the counter-claim, and reversed as to the claim of the petitioner, and that the case be remanded to be enforced according to the principles herein announced.